## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| STATEWIDE TOWING, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Docket No. 1:24-cv-00098-NT |
| | ) |
| METRO TOW TRUCKS LTD., | ) |
| ZURICH AMERICAN INSURANCE | ) |
| COMPANY OF ILLINOIS, and | ) |
| AMERICAN CLAIMS | ) |
| MANAGEMENT, INC., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANT METRO TOW TRUCKS LTD.'S
## MOTION TO DISMISS

Before me is Defendant Metro Tow Trucks Ltd.'s motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) (ECF No. 20). For the reasons stated below, the motion is **DENIED**.

## BACKGROUND

Statewide Towing, Inc. ("**Statewide**") is a towing and recovery company with a principal office in Chelsea, Maine. Aff. of Toby Watson ("**Watson Aff.**") ¶¶ 2, 4 (ECF No. 26). Statewide operates primarily in Maine. Watson Aff. ¶ 3. Toby Watson owns and operates the company. Watson Aff. ¶ 2. Statewide provides a variety of services, including heavy-duty operations. Watson Aff. ¶ 5. This work encompasses towing, recovering, and remediating accident scenes on roadways that involve tractor trailers, large commercial vehicles, and other types of heavy-duty equipment. Watson Aff. ¶ 5. Statewide performs this heavy-duty operation work at the request of Maine

law enforcement agencies and the general public. Watson Aff. ¶ 6. Unsurprisingly, heavy-duty operation work requires heavy-duty towing and recovery equipment. Watson Aff. ¶ 7.

Metro Tow Trucks Ltd. ("**Metro**") builds custom tow trucks and related equipment for towing and recovery work. Decl. of Jihad Webb Wehbe ("**Wehbe Decl.**") ¶ 5 (ECF No. 20-1). Jihad Webb Wehbe is Metro's Chief Executive Officer. Wehbe Decl. ¶ 2. Wehbe's son, Abdul Hamid Wehbe ("**Al**"), also works for Metro. Watson Aff. ¶¶ 12–13, 25. Metro is an Ontario Business Corporation with a principal place of business in Ottawa, Ontario. Wehbe Decl. ¶¶ 3–4. Metro has never owned or leased any property in Maine, participated in any trade shows or similar events in Maine, kept any bank accounts or assets in Maine, maintained a telephone number or mailing address in Maine, or had any personnel who live in Maine. Wehbe Decl. ¶¶ 6–11.

Metro advertises regularly in the "American Towman," which is a towing magazine that circulates across the United States, including in Maine. Watson Aff. ¶ 76; Pl. Statewide Towing, Inc.'s Opp'n to Def. Metro Tow Trucks Ltd.'s Mot. to Dismiss for Lack of Personal Jurisdiction ("**Pl.'s Opp'n**") Ex. 19 (ECF No. 22-19). In one advertisement, Metro used a picture of a rotator it sold to Statewide (the piece of equipment at issue in this litigation) to market its product line. Pl.'s Opp'n Ex. 19 at 6. The picture was taken at Statewide's facility in Maine and the rotator has Statewide's logo, name, and likeness prominently displayed across the side. Pl.'s

Opp'n Ex. 19 at 6. Statewide receives the "American Towman" magazine at its Maine facility. Watson Aff. ¶ 77.

In 2016, Statewide was in the market for a heavy-duty rotator, which is a specialized piece of towing and recovery equipment. Watson Aff. ¶ 8. Through its industry knowledge, Statewide knew that Metro manufactured this type of equipment. Watson Aff. ¶ 9. Watson and Al exchanged text messages about a 50-ton rotator Statewide was interested in buying from Metro. Watson Aff. ¶¶ 11, 14; Pl.'s Opp'n Ex. 2 at 1–6 (ECF No. 22-2). Watson traded these communications with Metro while he was in Maine, communicating with his Maine-registered cell phone with a "207" area code (which is the area code for the entire state of Maine). Watson Aff. ¶ 15. During the course of negotiations over the 50-ton rotator, Statewide bought several other products from Metro. Watson Aff. ¶¶ 16–17. For each purchase, Metro accepted payment and shipped the items to Statewide in Maine. Watson Aff. ¶¶ 16–17.

In 2017, Metro notified Watson that it was launching a new product: a 70-ton rotator (the "**Rotator**"), which would be larger than the 50-ton rotator they had already discussed. Watson Aff. ¶ 18. Watson was interested in the increased lifting power this new product offered. Watson Aff. ¶ 19. At that time, the Rotator was not ready for sale; it was still being built at a Metro manufacturing facility in China. Watson Aff. ¶ 20. In January of 2017, Al posted an advertisement for the Rotator on a website called Tow411.net. Watson Aff. ¶ 21. Metro also advertised the Rotator on generally accessible websites like Facebook and Instagram. Wehbe Decl. ¶¶ 13–14.

3

Watson saw the advertisement on Tow411.net and continued to discuss the potential purchase with Metro. Watson Aff. ¶ 21.

Talks continued and in March of 2018, Statewide officially agreed to purchase the Rotator from Metro. Watson Aff. ¶ 22. The total price for the Rotator with a 2007 Freightliner truck was $365,000. Watson Aff. ¶ 23. Metro prepared two sales orders on its letterhead for the purchase, one dated March 2, 2018 for the Rotator, and another dated June 15, 2018 for the Freightliner truck. Watson Aff. ¶¶ 24–25; Pl.'s Opp'n Exs. 4 & 5 (ECF Nos. 22-4, 22-5). Both sales orders listed Statewide's Maine address under the "Shipping address," "Sold To," and "Invoice address" fields. Watson Aff. ¶ 26; Pl.'s Opp'n Exs. 4 & 5. Metro provided a "Wire Transfer Information" document, which listed a "US Account Number" for Metro, as well as a Canadian physical address. Pl.'s Opp'n Ex. 6 (ECF No. 22-6).

In mid-2018, Metro informed Watson that work on the Rotator at their China facility was almost done. Watson Aff. ¶ 27. Statewide paid Metro a deposit with a check drawn on its bank account in Maine and financed the rest of the purchase through a Maine credit union. Watson Aff. ¶¶ 29–30. Wehbe tagged Watson in multiple Facebook posts with photographs of the Rotator, which thanked and congratulated him for the purchase. Watson Aff. ¶ 28; Pl.'s Opp'n Exs. 7 & 8 (ECF Nos. 22-7, 22-8).

Metro asked Watson to come to Canada to see the Rotator, which he did in October of 2018. Watson Aff. ¶ 31. This was the first time he had seen it in person.

Watson Aff. ¶ 31.[1] Statewide planned to take delivery of the Rotator in November of 2018 at the American Towman Exposition in Baltimore, Maryland. Watson Aff. ¶ 32. Statewide paid Metro in full for the remaining amount owed on the Rotator. Watson Aff. ¶ 33. Metro delivered the Rotator to Baltimore, with Al posting on Facebook on November 14, 2018: "Team Metro Tow Trucks Baltimore Bound!" Watson Aff. ¶ 35; Pl.'s Opp'n Ex. 11 (ECF No. 22-11). His post included an emoji of an American flag and a video of the Rotator being driven down a roadway. Watson Aff. ¶ 35; Pl.'s Opp'n Ex. 11.[2] But Watson did not leave Baltimore with the Rotator. When he saw its condition, he refused to accept the Rotator from Metro. Watson Aff. ¶ 36.

After Statewide refused to accept delivery of the Rotator in Baltimore, Metro brought it back to its Canadian facility for repairs. Watson Aff. ¶¶ 36–37. Following months of work in Canada, Metro was scheduled to deliver the Rotator to Statewide in Maine in early 2019, but the Rotator broke down on the way to Maine and had to be towed to a Freightliner dealership in Vermont. Watson Aff. ¶¶ 38–39. The Rotator spent almost a month at the Vermont dealership undergoing repairs. Watson Aff.

---

[1]    Metro claims that Statewide and Metro "negotiated the sale of the Rotator in Canada" and "shook hands and consummated the deal in Canada." Decl. of Jihad Webb Wehbe ("**Wehbe Decl.**") ¶¶ 16–17 (ECF No. 20-1). I do not credit these assertions because they are disputed. *See PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 16–17 (1st Cir. 2019). Statewide has provided sales orders for the Rotator and Freightliner truck that pre-date Watson's October 2018 trip to Canada. *See* Pl. Statewide Towing, Inc.'s Opp'n to Def. Metro Tow Trucks Ltd.'s Mot. to Dismiss for Lack of Personal Jurisdiction ("**Pl.'s Opp'n**") Exs. 4 & 5 (ECF Nos. 22-4, 22-5); Aff. of Toby Watson ("**Watson Aff.**") ¶ 31 (ECF No. 26).

[2]    Metro claims that it "does not transport and/or deliver the equipment it sells." Wehbe Decl. ¶ 19. I do not credit this fact because it is disputed. *See PREP Tours, Inc.*, 913 F.3d at 16–17. Among other evidence, Statewide has provided a February 2019 post by Al on the website TowForce (a rebranded version of Tow411.net) on behalf of Metro titled "Adventure into the US delivering New Wreckers," which read in part: "I had a great adventure into the US, whenever I am able to *I like to personally deliver these new wreckers*." Pl.'s Opp'n Ex. 12 (ECF No. 22-12) (emphasis added).

5

¶ 40. Watson refused to pay for this work. Watson Aff. ¶ 41. Metro paid the Vermont dealership directly for the repair costs and told Watson he could pick the Rotator up from the dealership. Watson Aff. ¶¶ 41–42; Pl.'s Opp'n Ex. 13 (ECF No. 22-13).

Watson drove to Vermont to pick up the Rotator and bring it to Maine. Watson Aff. ¶ 43. The Rotator did not pass its Maine state inspection, so it could not be driven on Maine roadways. Watson Aff. ¶ 44. Watson updated Metro and Metro instructed Watson to bring the Rotator to a Freightliner dealership in Maine for the repairs it needed to pass state inspection. Watson Aff. ¶ 45. Watson again refused to pay for repairs, so Metro paid the Freightliner dealership directly for the work it needed to become "road legal" in Maine. Watson Aff. ¶¶ 46–47; Pl.'s Opp'n Ex. 14 (ECF No. 22-14).

The Rotator continued to have problems and Watson updated Metro accordingly. Watson Aff. ¶ 48. In April of 2019, Metro sent two representatives to Statewide's facility in Maine to assist. Watson Aff. ¶ 49. The Metro representatives worked at Statewide's Maine facility, physically performing services on the Rotator. Watson Aff. ¶ 50. Metro then instructed Watson to bring the Rotator back to the Freightliner dealership in Maine. Watson Aff. ¶ 51.

Once there, Metro acted as the point person for work on the Rotator. Watson Aff. ¶ 52. For example, the invoice from the Freightliner dealership in Maine included a phone number for the "selling dealer" (Metro), followed by: "He will let us know what they will pay for. Mr. Al has taken over this job." Pl.'s Opp'n Ex. 15 at 1 (ECF No. 22-15). Elsewhere, the invoice lists a Canadian phone number and says to call

"Mr. G" with "any issues." Pl.'s Opp'n Ex. 15 at 3. "Mr. G" is Wehbe's brother, who is also involved with Metro. Watson Aff. ¶ 53. The next month, the Rotator was back at the Maine Freightliner dealership for more repairs. Watson Aff. ¶ 55. Watson believes Metro paid the dealership directly for its work on the Rotator in April and May of 2019. Watson Aff. ¶¶ 54–56.

At this point, Metro made arrangements to return to Maine once again to work on the Rotator. Watson Aff. ¶ 57. Al and one of Metro's head mechanics traveled to Maine in the summer of 2019 and spent several days physically performing services on the Rotator at Statewide's Maine facility. Watson Aff. ¶¶ 57, 60. Metro personnel returned to Statewide's Maine facility again in December of 2019 to perform additional work on the Rotator. Watson Aff. ¶ 61. After multiple unsuccessful attempts at fixing it in Maine, Metro informed Watson that it needed to take the Rotator back to Canada. Watson Aff. ¶ 62. But in the ensuing months, the COVID-19 pandemic hit and Metro could not take the Rotator across the border. Watson Aff. ¶ 63. Metro made arrangements with various United States vendors to try to fix the Rotator at Statewide's facility in Maine and other places, but none of these efforts were successful. Watson Aff. ¶ 64.

Once pandemic-related cross-border travel restrictions were lifted, Metro made plans to transport the Rotator from Maine to Canada. Watson Aff. ¶¶ 65–67. To this end, in November of 2021, a Metro employee emailed Statewide with instructions for a "letter of permission" Metro would need to present at the border to take the Rotator into Canada. Watson Aff. ¶¶ 66–67; Pl.'s Opp'n Ex. 17 (ECF No. 22-17). Metro

instructed Statewide to put the permission on Statewide letterhead. Watson Aff. ¶ 68; Pl.'s Opp'n Ex. 17. The letter gave permission to "Metro Tow Trucks Canada LTD and driver Paul Chartier" to take the Rotator "out of the state of Maine and over the US to Canada border for warranty repairs to be completed at the [Metro] facility" in Canada. Pl.'s Opp'n Ex. 18 (ECF No. 22-18).[3] Once in Canada, the Rotator underwent repairs at Metro's facility in Ottawa, Ontario. Wehbe Decl. ¶ 24.

In January of 2022, Metro returned the Rotator to Statewide's facility in Maine. Watson Aff. ¶ 70. But its stay was short. After just four days, the Rotator needed to go back to Metro's facility in Canada. Watson Aff. ¶ 71. Metro arranged to transport the Rotator back to Canada and told Statewide it would only have the Rotator in Canada for one week. Watson Aff. ¶¶ 72–73. But instead, Metro kept the Rotator for three months. Watson Aff. ¶ 73. According to Statewide, during this stay in Canada, Metro used the Rotator for its own, unauthorized purposes and caused it irreparable damage. Watson Aff. ¶¶ 73–74. When it was returned to Maine, Statewide observed the damage and deemed the Rotator a total loss. Watson Aff. ¶ 75.

In March of 2024, Statewide filed a complaint in this Court against Metro, as well as the Rotator's insurer and claims administrator. Compl. (ECF No. 1). Two of

---

[3]       According to Metro, it did not transport the Rotator back and forth between Maine and Canada. Wehbe Decl. ¶¶ 19–23. Metro claims that it "hired a company owned by Shaun Chartier called 10769924 Canada Inc." to transport the Rotator across the border. Wehbe Decl. ¶ 21; *see* Wehbe Decl. ¶¶ 22–23, 25. This fact is disputed, so I do not credit it. *See PREP Tours, Inc.*, 913 F.3d at 16–17. Once again, the documentary evidence contradicts Metro's assertion. The letter of permission references a driver named "Paul Chartier" (but the record is silent on whether he is affiliated with Shaun Chartier's company), and does not mention any company named "10769924 Canada Inc." Pl.'s Opp'n Ex. 18. The only company it names is Metro. Pl.'s Opp'n Ex. 18. Moreover, instructions for the letter of permission for cross-border travel came from Metro, not any other company. Pl.'s Opp'n Ex. 17.

the six counts in the Complaint are against Metro: Count I for negligence and Count II for conversion. Compl. ¶¶ 115–132. Generally speaking, Statewide alleges that Metro did not properly care for or repair the Rotator when it was in Metro's possession, and further, that Metro engaged in unauthorized use of the Rotator when it was supposed to be repairing it. Compl. ¶¶ 115–132. Metro moved to dismiss the claims against it under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Def. Metro Tow Trucks Ltd.'s Mot. to Dismiss for Lack of Personal Jurisdiction ("**Def.'s Mot.**") (ECF No. 20).[4]

## LEGAL STANDARD

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears "[t]he burden of proving that personal jurisdiction may be exercised in the forum state." *Kuan Chen v. U.S. Sports Acad.*, 956 F.3d 45, 54 (1st Cir. 2020). To meet this burden on the papers, without an evidentiary hearing, the plaintiff must "proffer[ ] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008). Under this "prima facie" approach, typically the plaintiff cannot simply rest on its pleadings, it must also provide the court with documentary evidence. *Id.*[5]

---

[4]     The other two defendants answered the Complaint, so this order only concerns the claims against Metro. *See* Defs., Zurich American Insurance Company of Illinois and American Claims Management, Inc.'s Answer to Pl.'s Compl. (ECF No. 9).

[5]     The two other methods for resolving whether the plaintiff has established personal jurisdiction are the preponderance method and the likelihood method, which "usually require an evidentiary hearing." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 n.2 (1st Cir. 2008). Neither party has requested an evidentiary hearing here, and each have proceeded under the prima facie approach in their briefing. *See* Def. Metro Tow Trucks Ltd.'s Mot. to Dismiss for Lack of Personal Jurisdiction ("**Def.'s Mot.**") 3 (ECF No. 20); Pl.'s Opp'n 11–12 (ECF No. 22).

"When deciding a motion to dismiss using the prima facie approach, the court must accept the plaintiff's properly documented evidentiary proffers as true and give 'credence to the plaintiff's version of genuinely contested facts.'" *Kuan Chen*, 956 F.3d at 54 (quoting *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016)). This means that facts put forth by the defendant are also fair game, but only if they are undisputed. *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 16–17 (1st Cir. 2019).

## DISCUSSION

When a federal court assesses personal jurisdiction in a diversity case, it "must determine whether the defendant's contacts with the state satisfy both the state's long-arm statute as well as the Due Process Clause of the Fourteenth Amendment." *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 258 (1st Cir. 2022). The "Declaration of purpose" section of Maine's long-arm statute instructs: "This section, to insure maximum protection to citizens of this State, shall be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment." 14 M.R.S. § 704-A(1). Accordingly, I "turn directly to the constitutional analysis." *Bluetarp Fin., Inc. v. Matrix Constr. Co., Inc.*, 709 F.3d 72, 79–80 (1st Cir. 2013).

Under the Due Process Clause of the Fourteenth Amendment, a court's authority to exercise jurisdiction over a defendant "depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional

notions of fair play and substantial justice.' " *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–317 (1945)). The focus of this inquiry is "the nature and extent of 'the defendant's relationship to the forum State.' " *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)).[6]

Specific, or "case-linked," jurisdiction concerns defendants who, although not at home in the forum state, nonetheless have sufficient contacts with the forum (namely, contacts that relate to the actual claims at play in the case) such that exercising jurisdiction over them comports with the limits of due process. *Id.* at 358, 359–60. The test for evaluating whether specific jurisdiction exists over an out-of-state defendant is three-fold: (1) "the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum"; (2) "the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in that state"; and (3) "the exercise of specific jurisdiction in the forum must be reasonable under the circumstances." *Kuan Chen*, 956 F.3d at 59 (internal quotations and citations omitted). "All three criteria must be satisfied to establish specific jurisdiction over a particular defendant in a particular state." *Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 95 (1st Cir. 2024). The plaintiff must establish these requirements for each claim. *Nandjou v. Marriott Int'l, Inc.*, 985 F.3d

---

[6]     There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). General, or "all-purpose," jurisdiction comes into play "only when a defendant is 'essentially at home' in the State." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Statewide Towing concedes, for purposes of the present motion, that this Court does not have general jurisdiction over Metro. Pl.'s Opp'n 12 n. 4; *see also* Def.'s Mot. 3–4 n.1.

135, 148 (1st Cir. 2021); *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289 (1st Cir. 1999). This test is "highly fact-specific" and not amenable to "mechanical application." *PREP Tours, Inc.*, 913 F.3d at 17 (internal quotations and citation omitted).

## I. Relatedness

To satisfy the relatedness requirement, "[t]he plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum.' " *Ford Motor Co.*, 592 U.S. at 359 (quoting *Bristol-Myers*, 582 U.S. at 262). The first part of this standard ("arise out of") probes the causal relationship between the defendant's in-forum contacts and the claims at issue in the case, while the second part ("relate to") "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 362. This is a "flexible, relaxed standard," which requires "only a demonstrable nexus" between the plaintiff's claims and the defendant's forum-based activities. *PREP Tours*, 913 F.3d at 18 (internal quotations and citation omitted).

Metro asserts that it "did not have any contact with the Rotator in Maine," so Statewide cannot meet the relatedness requirement. Def.'s Mot. 5. But Statewide offered evidence that Metro *did* have contact with the Rotator in Maine, multiple contacts, in fact. For example, Metro personnel traveled to Statewide's Maine facility three times to perform repair work on the Rotator. In addition, Metro acted as the point person for repair work performed on the Rotator at various dealerships, including dealerships in Maine. Notably, one Maine dealership invoice instructed that "Mr. Al has taken over this job." Pl.'s Opp'n Ex. 15 at 1. Metro's contacts with the Rotator in Maine were plentiful.

Metro also contends that Statewide's claims "focus" on damage to the Rotator while in Canada, and for that reason, Statewide cannot establish relatedness. It is true that Statewide does specifically mention Metro's 2022 work (or lack thereof) on the Rotator in Canada in the negligence count of its Complaint. Compl. ¶¶ 115–123. But it also incorporates all of the allegations that come before it, which include efforts to repair the Rotator in Maine before Metro took it back to Canada. Compl. ¶¶ 31–36, 115. In addition, Statewide's opposition to Metro's motion to dismiss, and the evidence submitted with it, make clear that its negligence claim relates to Metro's conduct not just in Canada, but in Maine as well. *See* Pl.'s Opp'n 14–15.[7]

Metro resists this conclusion by pointing to Watson's assertion that the "irreparable damage" to the Rotator happened in Canada. Def. Metro Tow Trucks Ltd.'s Reply in Supp. of its Mot. to Dismiss for Lack of Personal Jurisdiction ("**Reply**") 4 (ECF No. 25). But of course, if Metro's prior attempts to fix the Rotator in Maine had been successful, the Rotator never would have had to go back to Canada in the first place. *See P.C. Hoag & Co., Inc. v. Man Lift Mfg., Co.*, No. 15-cv-498-AJ, 2016 WL 1118257, at *4 (D.N.H. Mar. 22, 2016) (finding personal jurisdiction over a Wisconsin company in a New Hampshire court where "a significant portion" of the

---

[7]     For this reason, Metro's citation to *Kowalski v. Doherty, Wallace, Pillsbury & Murphy, Attorneys at Law*, 787 F.2d 7 (1st Cir. 1986) is inapposite. *See* Def.'s Mot. 5. There, the First Circuit held that a New Hampshire court lacked personal jurisdiction over a Massachusetts law firm for its alleged tortious representation of a New Hampshire resident in a Massachusetts court on Massachusetts claims. The plaintiff felt the *effects* of the tort allegedly committed in Massachusetts in her home state of New Hampshire, but that was not enough to establish personal jurisdiction. *Kowalski*, 787 F.2d at 10. Indeed, the defendant law firm did not practice law in New Hampshire at all. *Id.* at 9. This case might be on point if Metro had never traveled to Maine, transported the Rotator to and from Maine, or performed work on the Rotator in Maine. But, given that part of the alleged tortious conduct here was committed by Metro, in Maine, *Kowalski* does not control.

Plaintiff's "claims stem from the failure of [the Defendant's] Wisconsin technician to repair the lift while in New Hampshire."). I agree with Statewide that the alleged negligence was not an isolated incident; it recurred over time. Statewide's negligence claim clearly relates to Metro's contacts with Maine.

With respect to the conversion claim specifically, Metro maintains that this Court cannot exercise personal jurisdiction over it for an alleged conversion that occurred in Canada. Def.'s Mot. 6; Reply 2–3. Statewide counters that the negligence and conversion claims "both originated from conduct that took place in Maine." Pl.'s Opp'n 15. Statewide emphasizes that Metro had control over the Rotator in Maine repeatedly, including when it physically removed the Rotator from Statewide's facility in Maine "under the misrepresentation that it would only be gone for a week, not months." Pl.'s Opp'n 15. The relatedness issue presents a closer question for the conversion claim than for the negligence claim, but for the reasons that follow, I find that Statewide has nonetheless established relatedness for the conversion claim.

The "gist" of the tort "of conversion is the invasion of a party's possession or right to possession at the time of the alleged conversion." *Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 14, 157 A.3d 769 (internal quotations and citation omitted). A successful conversion claim requires a showing that:

> (1) the person claiming that his or her property was converted has a property interest in the property; (2) the person had the right to possession at the time of the alleged conversion; and (3) the party with the right to possession made a demand for its return that was denied by the holder.

14

*Id.* at ¶ 14. The key question is whether there is "a demonstrable nexus" between Statewide's conversion claim and Metro's Maine-based activities. *PREP Tours*, 913 F.3d at 18.

I find that there is such a nexus. Based on Statewide's properly documented evidence, Metro came to Maine to get the Rotator and bring it back to Canada under the guise of making repairs, but in fact used it for its own purposes. While much of (and perhaps all of) this alleged misuse may have occurred in Canada, it necessarily arose out of and relates to Metro's conduct in Maine. In addition to its physical presence in the state to initiate the alleged conversion, Metro's opportunity to convert only arose because of its repeated failures to fix the Rotator in Maine. Because Metro physically traveled to Maine to get the Rotator, Statewide's conversion cases—which largely deal with property that never set foot in the forum state, let alone set foot in the forum state in the defendants' possession—do not control. *See* Def.'s Mot. 6 (citing *Williams v. Dragone Classic Motor Cars*, No. 2:20-cv-00115-GZS, 2021 WL 1214498 (D. Me. Mar. 30, 2021)); Reply 2 (citing *Libersat v. Sundance Energy, Inc.*, 978 F.3d 315 (5th Cir. 2020)).[8] As the First Circuit has emphasized, relatedness is a "flexible,

---

[8]      One case Metro cites, *Adams v. Gissell*, No. 20-11366-PBS, 2021 WL 2786277 (D. Mass. May 24, 2021), requires additional comment. *See* Def.'s Mot. 6; Def. Metro Tow Trucks Ltd.'s Reply in Supp. of its Mot. to Dismiss for Lack of Personal Jurisdiction ("**Reply**") 2–3 (ECF No. 25). There, the plaintiff Adams asserted that a defendant Gissell (his ex-wife) stole ideas or items from him and used them for her own professional purposes in her work for a Utah-based company. *Adams*, 2021 WL 2786277, at *3. Gissell worked for the company remotely, first from Montana, and then from Massachusetts, where she moved with Adams so he could complete educational training. *Id.* at *1. Adams asserted a conversion claim against Gissell and the CEO/President of Gissell's Utah-based employer. *Id.* at *3. Adams alleged that Gissell stole his ideas before they moved to Massachusetts, but also that she "formulated plans" to take his ideas in Massachusetts. *Id.* at *11. Notably, Adams alleged in his original Complaint that the conversion took place in Massachusetts, but walked that back in his Amended Complaint. *Id.* at *11 & n.14. On these facts, the court found an insufficient nexus between the conversion claim and the defendants' Massachusetts-based activities. So, while at least Gissell seemingly had possession of the property in the forum state, the court concluded, based on the evidence

relaxed standard," and the three-part personal jurisdiction test overall is "highly fact-specific" and not amenable to "mechanical application." *PREP Tours, Inc.*, 913 F.3d at 17, 18. For that reason, I cannot rotely apply any hard-and-fast rules about conversion claims and personal jurisdiction. Here, on the facts of this case, Statewide's conversion claim arose out of or relates to Metro's Maine-based activities.

In addition, and zooming out, the allegedly tortious result here arose from the core relationship Metro sought to establish with Statewide. According to the First Circuit:

> When a foreign corporation directly targets residents in an ongoing effort to further a business relationship, and achieves its purpose, it may not necessarily be unreasonable to subject that corporation to forum jurisdiction when the efforts lead to a tortious result. The corporation's own conduct increases the likelihood that a specific resident will respond favorably. If the resident is harmed while engaged in activities integral to the relationship the corporation sought to establish, we think the nexus between the contacts and the cause of action is sufficiently strong to survive the due process inquiry at least at the relatedness stage.

*Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715–16 (1st Cir. 1996). Here, Statewide was allegedly harmed by activities integral to the relationship Metro sought to establish with it, namely, its source for buying and repairing heavy-duty equipment. *See Ford Motor Co.*, 592 U.S. at 371 (finding relatedness requirement satisfied where plaintiffs suffered in-forum injuries because of defective products a foreign defendant

---

before it, that the alleged conversion took place before she moved to Massachusetts, and therefore that the claim simply did not arise out of or relate to the defendants' contacts with the forum. *Id.* at *12. Here, there is a much more meaningful connection between the alleged conversion and Metro's contacts with Maine, given Metro's repeated presence in the forum for the purpose of conducting business with Statewide, including its trip to Maine specifically to pick up the Rotator at the outset of the alleged conversion.

"extensively promoted, sold, and serviced" in the forum). Statewide has established the relatedness requirement.

## II.   Purposeful Availment

"Under the purposeful availment requirement, there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Rosenthal*, 101 F.4th at 96 (internal quotations and citations omitted). The "cornerstones" of this inquiry are voluntariness and foreseeability. *Id.* Voluntariness concerns whether the defendant's contacts with the forum state were its own choice, and not the result of some other party's unilateral actions. *Rodríguez-Rivera v. Allscripts Healthcare Sols.*, 43 F.4th 150, 163 (1st Cir. 2022). Foreseeability concerns whether the defendant's connection with the forum state is such that it "should reasonably anticipate being haled into court there." *Rosenthal*, 101 F.4th at 96 (internal quotations and citation omitted). Accordingly, I must analyze whether Statewide has satisfied the purposeful availment requirement with respect to its tort claims against Metro.

Metro emphasizes its lack of official contacts with Maine (for example, its lack of a Maine bank account or mailing address) and argues that the act of entering into a contract with a Maine business is not enough to establish personal jurisdiction. Def.'s Mot. 7–8. But Metro's contacts with Maine far exceeded the act of contracting with Statewide. For example, Metro made multiple trips to the state to deliver the Rotator and take it back to Canada, sent Metro personnel to work on the Rotator at Statewide's Maine facility, and directed, took control over, and paid for the Rotator's

17

repair at a Maine Freightliner dealership. Metro took each of these actions deliberately; they are not the sort of "random, isolated, or fortuitous contacts" that fall short of purposeful availment. *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016) (internal quotations and citations omitted).

Metro also placed advertisements in publications that circulate in Maine, a contact that points to its efforts to avail itself of the privilege of conducting business in the state. *See Nowak*, 94 F.3d at 717. What is more, Metro used Statewide's logo, name, and likeness in one such advertisement, a clear sign that it was purposefully targeting the Maine market. Even more, Metro repeatedly tagged Watson in Facebook posts about the Rotator. These posts were clearly meant, at least in part, to trade on Watson's business reputation in Maine to garner attention and interest in Metro's product line. *See, e.g.,* Pl.'s Opp'n Ex. 7 (Wehbe's Facebook post showing photos of the Rotator, tagging Watson while extolling the Rotator's virtues, and encouraging viewers to contact Metro for additional information). Moreover, the First Circuit has found that directly building and maintaining relationships with purchasers in the forum supports a finding of purposeful availment. *See Rodríguez-Rivera*, 43 F.4th at 165. That is the case here: Metro's relationship with Statewide— and more specifically, its relationship with Statewide *in Maine*—continued long after Statewide bought the Rotator from Metro. The purposeful availment requirement is satisfied.

## III.   Reasonableness

The third and final requirement is that the exercise of jurisdiction is reasonable. To evaluate this requirement, I must consider the following factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Mojtabai v. Mojtabai*, 4 F.4th 77, 87 (1st Cir. 2021) (quoting *Adelson v. Hananel*, 510 F.3d 43, 51 (1st Cir. 2007)). Reasonableness is assessed on "a sliding scale." *Baskin-Robbins Franchising LLC*, 825 F.3d at 40. If the plaintiff makes a strong showing on the relatedness and purposeful availment requirements, the defendant must make a strong showing of unreasonableness to defeat jurisdiction; and conversely, if the plaintiff makes a weak (but still passable) showing on the first two requirements, some lesser showing of unreasonableness may defeat jurisdiction. *See C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 69, 71 (1st Cir. 2014). On the relatedness requirement, Statewide made a strong showing on the negligence claim and a weaker showing on the conversion claim. It made a strong showing on purposeful availment requirement for both claims.

For the first factor, the First Circuit has observed that "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly," so "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994). Metro points out that its witnesses and records are based in Canada, and its facility is over 400 miles away from this Court's Bangor courthouse. Def.'s Mot. 9. Statewide counters that this claim of burden is undercut by Metro's numerous trips to Maine during the events giving rise to this dispute, regular attendance at United States trade shows in states farther

19

away from its Canadian location than Maine, and travel to its manufacturing facility in China, which is thousands, not hundreds, of miles away from its Canadian homebase. Pl.'s Opp'n 17. Statewide has the better argument. I see no special or unusual burden in having Metro litigate in Maine, a place it visited repeatedly in its regular course of business in the years leading up to this lawsuit.

For the second factor, Maine has a clear interest in providing a convenient forum for its citizens to resolve disputes and remedy injuries inflicted by out-of-state actors. *See Adelson*, 510 F.3d at 51–52. Metro maintains that Maine's interest in this suit is diminished because "the allegedly actionable conduct occurred in Canada." Def.'s Mot. 9. But as Statewide points out, that factual assertion is disputed: according to Statewide, "the majority of the conduct took place in Maine," and further, the injuries were caused within Maine, to a Maine resident. Pl.'s Opp'n 18. Maine has an interest in adjudicating this dispute.

For the third factor, Metro concedes that it weighs in Statewide's favor because Statewide is a citizen of Maine. Def.'s Mot. 10.

For the fourth and fifth factors, Metro again emphasizes the alleged actionable conduct and damage that took place in Canada. Def.'s Mot. 10. Statewide points to Metro's Maine-based conduct, and further asserts that the United States and Canada have a common interest in open trade, an interest that is furthered by having a convenient forum to litigate disputes. Pl.'s Opp'n 18. Statewide does not explain why Canada would deem Maine a more convenient forum, but I do find that each sovereign has an interest in regulating the conduct of businesses that sell goods and provide

services to their citizens within their borders. Here, Maine has an interest in enforcing its tort laws when a Maine citizen is injured by a foreign company that markets and sells its products to people in Maine. *See Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 12 (1st Cir. 2002).

Taken together, the reasonableness factors weigh in favor of personal jurisdiction. In this analysis, I have not found the sort of unreasonableness that would outweigh Statewide's showings of relatedness and purposeful availment. The exercise of specific jurisdiction over Metro in Maine is reasonable under the circumstances. Having met all three requirements—relatedness, purposeful availment, and reasonableness—Statewide has carried its burden of proving that this Court may exercise personal jurisdiction over Metro.

## CONCLUSION

For the reasons stated above, Defendant Metro Tow Trucks Ltd.'s motion to dismiss (ECF No. 20) is **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 25th day of November, 2024.